*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* ESTATE OF NILA JEAN OXENDER.

DERRICK B. OXENDER,

Appellant,

v

THEODORE LAVERN OXENDER, as personal representative of the ESTATE OF NILA JEAN OXENDER, and MARITZA OXENDER,

Appellees.

UNPUBLISHED
February 20, 2020

No. 346316
Washtenaw Probate Court
LC No. 17-000428-DE

Before: GLEICHER, P.J., and GADOLA and LETICA, JJ.

PER CURIAM.

Appellant, Derrick B. Oxender, appeals as of right the order of the probate court granting summary disposition to appellees, Theodore (Ted) Oxender and his wife, Maritza Oxender, and denying appellant's petition requesting that Ted Oxender be removed as personal representative of the estate of decedent Nila Jean Oxender and appellant's motion to stay the probate court proceedings. We affirm.

## I. FACTS

This case arises from Ted Oxender's attempt to probate the estate of his mother, Nila Jean Oxender, who died on November 23, 2016. In 2007, Nila Jean executed a will designating Ted Oxender as personal representative. She later executed an amendment to her revocable trust naming Ted Oxender as trustee and beneficiary, with the successor beneficiary being Ted Oxender's Living Trust, and the next successor being Knox Presbyterian Church in Ann Arbor.

-1-

Nila Jean also established an irrevocable trust naming Ted Oxender as primary beneficiary and trustee and Maritza as successor. The will and the revocable trust expressly excluded her other son, appellant Derrick Oxender, and his descendants.

In 2016, Nila Jean decided to make Tucson, Arizona her permanent residence. On November 2, 2016, Nila Jean emailed her estate lawyer, Terrance Bertram, to confirm a telephone conference scheduled for November 23, 2016. The email indicated that the purpose of the telephone conference was to discuss a possible change to her estate plan to remove her former church, Knox Presbyterian Church in Ann Arbor, as a contingent beneficiary and to instead name a different charity that she had not yet determined. The parties do not dispute that at that time, Nila Jean was 84 years old and was generally in good health, but took medication for high blood pressure.

On November 22, 2016, Ted and Maritza arrived in Tucson to visit Nila Jean for Thanksgiving. Nila Jean met appellees at the airport and drove them to her home where they ate dinner and shared a bottle of champagne. After dinner, Nila Jean retired to her room at about 10:00 p.m. The decedent's sister stated in an affidavit that Nila Jean liked to sit in the hot tub on the patio next to her bedroom before going to bed. The next morning, November 23, 2016, shortly before the telephone conference with her estate attorney was to occur, Ted and Maritza discovered that Nila Jean had drowned in the hot tub.

The Pima County Sheriff's Department investigated Nila Jean's death and concluded that "there was nothing suspicious" and there was "no physical or circumstantial evidence . . . that Ted or Maritza Oxender had anything to do with the death of Nila Jean Oxe[n]der or that there was any foul play involved." The Pima County medical examiner determined Nila Jean's cause of death to be drowning and the manner of her death to be "undetermined."

Appellee Ted Oxender filed for informal probate with the probate court on April 28, 2017, and was appointed as personal representative of the estate on May 2, 2017. On September 1, 2017, appellant Derrick Oxender filed a petition (the first petition) requesting discovery into the circumstances of Nila Jean's death. The probate court issued an order dated December 14, 2017 permitting appellant to conduct discovery of the matters raised in the petition. The probate court also issued a "status quo" order prohibiting distribution of the estate without court order.

On April 9, 2018, appellant filed a second petition seeking to remove Ted Oxender as personal representative of the estate on the ground that Ted and Maritza were responsible for the death of Nila Jean, and that as a result Ted had a conflict of interest that precluded him from performing his duties as personal representative. The second petition alleged appellant's theory that Nila Jean planned to revise her estate plan to give appellant a greater share of her estate and that appellees killed her to prevent that from occurring. Although the probate court did not enter a new scheduling order after the filing of the second petition, the probate court's existing scheduling order permitted discovery regarding the circumstances surrounding Nila Jean's death until discovery closed on June 22, 2018. During discovery, eight depositions were taken and appellant obtained over 21,000 documents.

On June 27, 2018, appellees moved for summary disposition of appellant's first and second petitions under MCR 2.116(C)(10). Appellant then filed a third petition, seeking relief under the

"slayer statute," MCL 700.2803. Appellant thereafter moved to voluntarily dismiss the first and second petitions without prejudice, while appellees moved additionally for summary disposition of the third petition. On September 27, 2018, appellant allegedly filed a wrongful death action against appellees in Arizona, and moved for a stay of the probate court proceedings while the wrongful death action was pending.

After a hearing on the motions, the probate court issued its order rescinding the status quo order, granting appellees summary disposition, noting that the first petition had been resolved,[1] denying the second petition on the merits, permitting appellant to withdraw the third petition, and denying appellant's motion for stay of the probate proceedings. Appellant now appeals from the probate court's order.

## II. DISCUSSION

### A. SUMMARY DISPOSITION

Appellant first contends that the probate court erred in granting appellees' motion for summary disposition of appellant's second petition. Appellant argues that there is a genuine issue of material fact whether appellees were responsible for decedent's death, and therefore whether Ted Oxender has a conflict of interest and should be removed as personal representative of the estate. We disagree.

This Court reviews de novo a trial court's decision to grant or deny summary disposition. *Dawoud v State Farm Mut Auto Ins Co*, 317 Mich App 517, 520; 895 NW2d 188 (2016). When reviewing an order issued pursuant to MCR 2.116(C)(10), this Court considers all documentary evidence submitted by the parties in the light most favorable to the nonmoving party. *Id*. Summary disposition under MCR 2.116(C)(10) is warranted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Id*. In addition, we review a probate court's decision regarding the appointment or removal of a personal representative for an abuse of discretion. *In re Kramek Estate*, 268 Mich App 565, 575-576; 710 NW2d 753 (2005). The probate court abuses its discretion when it chooses an outcome outside the range of reasonable and principled outcomes. *In re Temple Marital Trust*, 278 Mich App 122, 128; 748 NW2d 265 (2008). We review the probate court's factual findings for clear error. *Id*.

In his second petition, appellant sought to have Ted Oxender removed as personal representative of Nila Jean's estate and requested that appellant be appointed as the successor personal representative or special personal representative to pursue a wrongful death action, presumably against appellees. The second petition alleges that in the months before her death, Nila Jean told appellant that she was making changes in her will because she did not want her money "going to Chile" in apparent reference to appellee Maritza Oxender, and also made comments to her financial planner, Michael Reid, suggesting that she wanted her estate plan altered

---

[1] The probate court's October 29, 2018 order states with regard to appellant's first petition that "[t]his court addressed all of the requests in this petition in the orders on December 14, 2017 and May 24, 2018. This petition has been resolved." The parties apparently do not dispute the resolution of the first petition.

so that her assets would be more evenly distributed between her two sons. The second petition also suggests that Nila Jean's death was not an accident but was instead the result of foul play. The petition suggests that the fact that Nila Jean's death occurred the night before she was to have a conference call with her attorney for the purpose of revising her estate plan, and that appellees were staying in her home on the night of her death, demonstrate that appellees likely killed Nila Jean. Appellant argues that as a result, Ted Oxender is unable to carry out his duty as personal representative to bring a wrongful death action on behalf of the estate.

When considering appellees' motion for summary disposition of appellant's second petition, the trial court summarized the evidence and determined as follows:

Derrick's best evidence includes:

- Ted's wife changed decedent's password on an account.

- Decedent was not fond of Ted's wife and was only polite to her because she was Ted's wife.

- A few months before her death, decedent told her financial planner that she was uncomfortable with the unequal distribution of her estate and that she did not want the money to go to Chile. (A reference to Ted's wife)[.]

- Decedent had a telephone meeting set with her estate attorney for 11-23-16. Decedent was found dead the morning of 11-23-16.

- Pathologist Ljubisa Dragovic opined that foul play [led] to the demise of Nila Oxender.

- Pathologist Jeffrey Jentzen opined that the manner of death of the 84 year old is indeterminate.

- Decedent was an experienced and regular hot tub user.

- At Ted's direction, the decedent was cremated.

- Ted did an internet search for whether Gmail permanently deletes trash, how to send emails from a different email address.

A motion under (C)(10) tests the factual support for a claim. The moving party may demonstrate to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. If the nonmoving party cannot muster sufficient evidence to make out its claim, a trial would be useless and the moving party is entitled to summary judgment as a matter of law.

After thousands of pages of discovery and hours of depositions, and over 1400 pages of pleadings, Derrick has shown nothing more than unexpected timing

and that decedent did not adore her daughter in law. The record is replete with hyperbole by Derrick's attorney. . . .

The report of the two pathologists hired by Derrick are both premised on the notion that decedent was going to make major changes to her estate. That claim is not supported by the evidence. One of the pathologist's reports referred to the ". . . discovery of the victim's plans to implement major changes in her will and estate planning." The other pathologist's reports stated, "Nila Jean had scheduled a telephone conference . . . on November 23, 2016 with her estate attorney to make changes to her estate plan, including whether and how to remove Ted Ozender's (sic) wife Maritza Oxender from the decedent's trust and estate." There was, however, no evidence in the record of major changes proposed and scant evidence that [Nila] Jean didn't like Maritza. Both pathologist reports are based, in large part, on information that is simply not supported by any evidence. Taking the facts in light most favorable to Derrick, they do NOT show that the decedent had plans to make major changes to her estate plan, thus the pathology reports are fatally flawed.

The initial request of the 2[n]d petition is to remove Ted as personal representative. As stated above, there is no genuine issue of material fact proving that Ted, either alone or in concert with this wife, killed [Nila] Jean. [Emphasis omitted.]

The trial court's conclusion that the record does not support appellant's allegations that Nila Jean was murdered by Ted Oxender and/or Maritza Oxender, and that there is no basis to remove Ted as personal representative, is accurate. MCL 700.3611(2) authorizes the probate court to remove a personal representative as follows:

(2) The court may remove a personal representative under any of the following circumstances:

(a) Removal is in the best interests of the estate.

(b) It is shown that the personal representative or the person who sought the personal representative's appointment intentionally misrepresented material facts in a proceeding leading to the appointment.

(c) The personal representative did any of the following:

(*i*) Disregarded a court order.

(*ii*) Became incapable of discharging the duties of office.

(*iii*) Mismanaged the estate.

(*iv*) Failed to perform a duty pertaining to the office.

Appellant's second petition alleged that removal of Ted Oxender as personal representative was in the best interests of the estate under MCL 700.3611(2)(a) and also that Ted Oxender's inability to bring the wrongful death action against appellees prevented him from properly performing and discharging his duties as personal representative under MCL 700.3611(2)(c)(*ii*) and (*iv*). But although MCL 700.3611(2)(a) broadly states that the probate court may remove a personal representative when it is "in the best interests of the estate" a probate court is required to cite a legitimate basis for removal that is in the best interests of the estate. See *In re Kramek Estate*, 268 Mich App at 576. Thus, for appellant to demonstrate that his allegation is a legitimate basis to remove appellee as personal representative, there must be some evidence to support appellant's theory that Ted and/or Maritza caused the death of Nila Jean. As the probate court observed, however, there is no evidence in the record that Nila Jean died in a way that would support a wrongful death claim.

To establish an action for wrongful death, a plaintiff must establish that (1) a death occurred, (2) the death was caused by a wrongful act, neglect, or fault of another, and (3) if the death had not resulted, the injured party would have been able to maintain an action and recover damages. See MCL 600.2922(1); *Simpson v Alex Pickens, Jr & Assoc, MD PC*, 311 Mich App 127, 136; 874 NW2d 359 (2015). In this case, there was no evidence that Nila Jean's death was caused by a wrongful act, neglect, or fault of another. According to the Pima County Sheriff's Department incident report, the decedent's death was not classified as a homicide and "[t]here were no obvious signs of trauma" and "there was nothing suspicious and it was an unknown cause of death at this point." The autopsy report from the Pima County Sheriff's Office ultimately reported the cause of death as drowning and the manner of death as "undetermined."

The report of appellant's expert witness, Ljubisa Dragovic, MD, stated that Nila Jean died as the result of "foul play." During his deposition, however, Dr. Dragovic testified that before preparing his report he had been informed that the decedent had died on the eve of changing her estate plan in a way that would affect her beneficiaries, and that this information increased his suspicion regarding the decedent's cause of death. Dr. Dragovic also acknowledged that he had not known previously that the decedent had a history of the condition known as syncope, which can cause a rapid loss of blood pressure and can result in temporary loss of consciousness or blackouts. Dr. Dragovic agreed that blood pressure medication, alcohol, and warm water also can have the effect of lowering blood pressure. Dr. Dragovic also agreed that it was possible for someone having a syncope episode to drown while unconscious.

Appellant also presented the report of his rebuttal expert, Jeffrey Jentzen, MD, a forensic pathologist, who opined in his report as follows:

> Nila Jean Oxender died as the result of drowning and [] the manner of death is indeterminate. Bathtub drownings are relatively rare. The investigator must identify [] not only findings of drowning but rule out other causes of death and identify the mechanism of the drowning. In this case, there were additional circumstances such as other individuals in the home, the desire to change her will and the impending meeting with her lawyers that led one to question the cause and mechanism of the drowning. It is these circumstances and the lack of autopsy and scene findings that make this death highly suspicious and indeterminate and possibly homicide.

Although the reports of both appellant's experts suggest that the circumstances of Nila Jean's death are suspicious, the trial court accurately observed that both experts based their conclusions on incorrect information that Nila Jean was planning to change her estate plan the next day to the detriment of her son and his wife, who happened to be her houseguests on the night of her death. The experts' conclusions were not based upon any physical evidence of homicide, and appellant did not present any physical evidence that Nila Jean's death was anything other than an accidental drowning.

Instead, most of appellant's evidence purports to demonstrate that appellees had a motive to kill Nila Jean because she died on the eve of changing her estate plan in a way that would benefit appellant and his family to the detriment of appellees. However, there is little evidence that Nila Jean intended to alter her estate plan in this way. The idea that Nila Jean was planning to alter her estate plan appears to come primarily from appellant's affidavit and the testimony of Nila Jean's financial planner, Michael Reid. Reid testified during his deposition that he first became friends with Derrick Oxender in 1996 or 1997, and in 2003 began providing Nila Jean with financial planning and investment management services after meeting with her, Ted, and Nila Jean's attorney, Terrence Bertram. In 2012, he also began providing financial planning and investment management services for Derrick as well. Although Reid began the same financial relationship with Ted and Maritza, at some point that relationship was terminated.

Reid testified that he talked with Nila Jean often on the telephone regarding her investments, and sometimes met with her in person. He stated that Nila Jean had told him on several occasions beginning in approximately 2015 that she was uncomfortable that her trust assets and IRA assets were not to be equally divided between her two sons. Reid further testified that Nila Jean told him that she was worried about Ted's health, and wanted her assets to stay within the family and with her lineal descendants, meaning Derrick's children.

Reid traveled to Tucson and met with Nila Jean on September 28, 2016, regarding her financial planning. During the meeting, Reid showed her a graph that depicted the uneven distribution of assets between her two sons. According to Reid, Nila Jean then asked him if he could make the distribution between her two sons more even, and he suggested that they discuss the topic with her attorney and her sons. However, Reid acknowledged that his notes from the September 28, 2016 meeting indicate that he and Nila Jean discussed various financial topics while Ted Oxender participated in the discussion by telephone, but that "following the conclusion of the call, I had a separate discussion with [Nila] Jean regarding distribution of assets in her estate plan." Reid admitted that his notes do not reflect that Nila Jean planned to make any changes to her estate plan. Reid testified the he was aware that Nila Jean was planning to confer with her attorney in November 2016, but also admitted that his other notes from his meetings with Nila Jean do not reference her having any concerns regarding the distribution of her assets. He also agreed that after his meeting with Nila Jean in September 2016, she did not, in fact, make any changes to her estate plan.

Before Nila Jean met with Reid in Tucson on September 28, 2016, she sent an email to Ted Oxender confirming that Ted would participate by telephone in her meeting with Reid. The email also asked Ted if he knew what the agenda was for the meeting with Reid because she did not know. When asked about this email, Reid admitted that he was the one who suggested the meeting

and that the main purpose of the meeting was for him to demonstrate to her new financial software that he was recommending.

Appellant also submitted to the probate court the affidavits of various friends and family members averring that Nila Jean was not fond of her daughter in law, that Nila Jean's comments often reflected the opinions of the people around her, and that in the past she had been more generous with her money but appellees had begun to monitor her spending more closely.

It is undisputed, however, that in early November 2016, Nila Jean sent an email to attorney Bertram's office scheduling the upcoming meeting. The email stated:

> "Hi, Kelly. The November 23 slot would be perfect. Ted and Maritza will be here. We can put Terry [attorney Bertram] on speakerphone. They have been my confidants from the beginning of this trust and in all of my financial meetings with you and Mike for many years.
>
> I really do not want to make any major changes in my trust. Just to take Knox [Presbyterian Church] off (if they are on it).
>
> I am thinking of a long-term Christian Donors Trust. We will be searching several I have in mind. I want what my Dad called THE PEACH TREE LIMB CLAUSE IN IT FOR SURE. If any one objects to the way it is set up…. he loses his part.
>
> Ted is completely reliable and competent to divide this up in the manner of my and Dale's wishes.
>
> Thank you for setting this up on November 23 around 8 AM AZ time. Only 2 hours difference on this date.
>
> Jean

Our review of the record supports the conclusion of the trial court that there is little evidence that the decedent was planning to change her existing estate plan at the time of her death to benefit appellant. She had scheduled a telephone conference with her attorney for the following morning, but indicated that Ted and Maritza would be included in the call. Her email to her attorney's office indicated that she did not want to make any major changes to the estate plan, but just wanted to remove her former church as a contingent beneficiary. Although Derrick averred and Reid testified that she had mentioned several times that she was concerned about the uneven distribution of her assets to her two sons, there is no indication that she was acting on that concern and her November 3, 2016 email suggests that she was not acting on that concern. Reid admitted that he was the one who suggested the September 2016 meeting and showed her the graph illustrating the disparity between the estate plan's treatment of her two sons, and admitted that his notes from that meeting do not indicate that Nila Jean was planning to change her estate plan.

The probate court also correctly concluded that there is no evidence establishing that Nila Jean's death was a homicide. Both expert witnesses presented by appellant based their opinions of possible foul play not on medical findings, but on generalized suspicion founded on the incorrect information that the decedent was on the eve of making a major change to her estate plan to the

detriment of Ted and Maritza, who were her houseguests on the night of her death. Moreover, the investigation of law enforcement and the autopsy by the coroner concluded that there was no evidence that Nila Jean's death was anything other than an accidental drowning. Because there is no evidence that her death was not accidental or that it was in any way caused by another person, there is no support for a wrongful death action and no support for appellant's theory that Ted Oxender should be removed as personal representative for failure to pursue such an action.

## B. SPOLIATION OF EVIDENCE

Appellant next contends that appellees intentionally or negligently destroyed information from Nila Jean's electronic devices, such as emails. Appellant argues that as a result, he was entitled to a presumption by the trial court that the missing evidence favored his position, i.e., an adverse inference. We disagree.

Initially, we note that the probate court stated that in considering appellees' motion for summary disposition, "[t]he court has considered all pleadings, affidavits, depositions, admissions and document evidence in the light most favorable to Derrick." Thus, the trial court gave appellant the evidentiary presumption to which he was entitled as the nonmovant in a motion for summary disposition.

With specific regard to whether appellant was entitled to a presumption that the allegedly destroyed emails favored his position, appellant refers to a trial court's ability to sanction a party who has destroyed evidence. A party has a duty to preserve evidence material to pending or reasonably foreseeable litigation. *Brenner v Kolk*, 226 Mich App 149, 162; 573 NW2d 65 (1997). When a party has failed to preserve or has "spoliated" material evidence, a trial court is permitted to draw an adverse inference against that party if (1) the evidence was under a party's control and could have been produced, (2) the party lacks an excuse for failure to produce the evidence, and (3) the evidence is material, not cumulative, and not equally available to the other party. *Ward v Consol Rail Corp*, 472 Mich 77, 85-86; 693 NW2d 366 (2005). A party may rebut an adverse inference by presenting a "nonfraudulent explanation for its decision to discard" evidence that it has destroyed or failed to preserve. See *Id*. at 85. "No adverse inference arises if [the party] has a reasonable explanation for its failure to produce the missing evidence." *Id*. at 86. We review a trial court's decision to sanction a party for spoliation of evidence for an abuse of discretion. *Brenner*, 226 Mich App at 160-161.

In this case, there is no evidence that appellees destroyed or failed to produce evidence. Appellant argues that after Nila Jean's death, appellees took control of her electronic devices. Ted Oxender testified that after his mother's death, he created a copy of her entire Gmail account and only deleted items from the copy that were irrelevant, such as advertisements, and thus appellant was provided a complete record of Nila Jean's emails, and further, that the complete record of the email account was also still available to appellant through Google. Appellant points to no place in the record where it was demonstrated that appellees destroyed material evidence, nor did appellant rebut Ted's "nonfraudulent explanation" that the only deletions from Nila Jean's account were advertisements and that the deletions were made to a copy of the account only, and the original account remained intact. Therefore, appellant's claim of entitlement to an adverse inference, applicable only where material evidence has been destroyed without a valid explanation, is without merit.

-9-

## C. INCOMPLETE DISCOVERY

Appellant next contends that the trial court prematurely granted summary disposition before discovery was completed and failed to enter a second scheduling order for discovery after appellant filed a second petition, unfairly precluding him from completing discovery. Initially, we note that appellant points to no place in the record where he requested additional discovery or an extension of the trial court's discovery deadline established in the scheduling order. This issue is therefore unpreserved. See *Elahham v Al-Jabban*, 319 Mich App 112, 119; 899 NW2d 768 (2017). Although this Court reviews a trial court's decision to limit discovery for an abuse of discretion, see *Augustine v Allstate Ins Co*, 292 Mich App 408, 419; 807 NW2d 77 (2011), this Court generally will decline to address unpreserved issues unless a miscarriage of justice will result from the failure to do so, the question is one of law and the facts necessary to resolve the issue have been presented, or it is necessary to do so for a proper determination of the case. *Autodie, LLC v City of Grand Rapids*, 305 Mich App 423, 431; 852 NW2d 650 (2014). In any event, we disagree that appellees' motion was granted prematurely or that appellant was unfairly precluded from completing discovery.

In both appellant's first and second petitions, appellant asserted that appellees caused Nila Jean's death. After the first petition was filed, the trial court entered a scheduling order permitting discovery on the issue of the circumstances of Nila Jean's death. The discovery deadline was later extended to June 22, 2018. Appellant does not contend that he requested an extension of this deadline nor that he asked for additional discovery after filing the second petition. After the discovery deadline passed, appellees moved for summary disposition.

Although Michigan has a broad discovery policy, decisions regarding discovery are discretionary with the trial court. *Augustine*, 292 Mich App at 419. Establishing a cutoff date for discovery is considered a traditional exercise of the trial court's authority, and enforcing the deadlines established by the trial court in a scheduling order is within the discretion of the trial court. See *Kemerko Clawson, LLC v RXIV Inc*, 269 Mich App 347, 349; 711 NW2d 801 (2006).

Generally, a motion for summary disposition is premature if discovery on a disputed issue is not complete. *Bodnar v St. John Providence, Inc*, 327 Mich App 203, 231; 933 NW2d 363 (2019); *Caron v Cranbrook Ed Community*, 298 Mich App 629, 645-646; 828 NW2d 99 (2012). In this case, the probate court permitted discovery regarding the circumstances of Nila Jean's death until the discovery cutoff date established by the probate court in its amended scheduling order, being June 22, 2018. The motion for summary disposition was filed after this date. Discovery was therefore complete when the motion was filed.

However, even when discovery is not complete, summary disposition nonetheless may be appropriate if further discovery is unlikely to produce factual support for the opposing party's position. *Bodnar*, 327 Mich App at 231. Thus, a party opposing a motion for summary disposition on the ground that discovery is not complete must provide some evidence that further discovery would provide factual support for his or her claims. *Caron*, 298 Mich App at 645-646. Mere speculation that additional discovery will provide factual support for a claim is not sufficient. *Id*. at 646.

In this case, there is no indication that discovery of the circumstances of Nila Jean's death was not adequately conducted under the trial court's scheduling order. In fact, appellant conducted extensive discovery on this issue, deposing eight witnesses and obtaining 21,000 documents, and yet this extensive discovery did not produce factual support for appellant's theory that appellees were responsible for Nila Jean's death. Because there was no indication that further discovery was reasonably likely to uncover factual support for appellant's claim, the trial court did not abuse its discretion by granting summary disposition without ordering further discovery. See *Bodnar*, 327 Mich App at 231. We also reject appellant's contention that the trial court "unilaterally suspended all discovery" in its July 19, 2018 order before granting appellees summary disposition. In fact, pursuant to the probate court's scheduling order, the discovery deadline was June 22, 2018. Therefore, at the time of the July 19, 2018 order, discovery was already complete.

## D. EXAMINATION OF APPELLEES' ELECTRONIC DEVICES

Appellant next contends that the probate court abused its discretion by refusing to permit appellant to conduct a "forensic" examination of appellees' electronic devices. Through discovery, appellant sought all electronic devices that appellees had used to communicate with Nila Jean and with each other from January 1, 2016 to the time of the request. Appellant argued that the purpose of the request was to discover evidence that appellees had destroyed information from Nila Jean's electronic devices. The probate court denied appellant's motion for the discovery and granted appellees a protective order prohibiting appellant from obtaining their personal electronic devices. This Court reviews a trial court's decision to limit discovery for an abuse of discretion. See *Augustine*, 292 Mich App at 419.

Although this issue has not been specifically addressed under Michigan law, we take note of federal authority denying a party intrusive examination of an opponent's computer on the mere suspicion that the opponent may be withholding discoverable information. See *FCA US LLC v Bullock*, 329 FRD 563, 568 (ED Mich, 2019). Forensic examination of an opponent's electronic devices is considered a drastic measure and courts are "loathe to sanction intrusive examination of an opponent's computer as a matter of course, or on the mere suspicion that the opponent may be withholding discoverable information." *Motorola Solutions, Inc v Hytera Comm Corp*, 314 F Supp 3d 931, 939 (ND Illinois, 2018), quoting *In re Ford Motor Co*, 345 F3d 1315 (CA 11, 2003).

Moreover, this Court has held generally that a trial court acts within its discretion when it limits discovery that has become excessive or abusive. *Chastain v Gen Motors Corp*, 254 Mich App 576, 593; 657 NW2d 804 (2002). Michigan's broad discovery policy does not extend to fishing expeditions, and thus discovery is not allowed on the basis of conjecture alone. See *Augustine*, 292 Mich App at 419-420. Although appellant suspects that appellees deleted electronic records from Nila Jean's electronic devices and hoped that evidence of that could be found in appellees' private electronic communications, there was no evidentiary support for appellant's theory that the records ever existed. Because there is no support for appellant's theory that information was deleted from Nila Jean's devices, nor that evidence of such deletions could be found on appellees' devices, the trial court acted within its discretion in limiting discovery of appellees' electronic devices.

## E. MOTION TO STAY

Appellant also contends that the probate court abused its discretion by denying his motion to stay the probate court proceedings while the wrongful death action filed in Arizona was pending. Again, we disagree.

Appellant asserts that on September 27, 2018, he initiated a wrongful death action against appellees in Arizona. He then moved in this case to dismiss without prejudice his earlier petitions and to stay the probate court proceedings pending resolution of the wrongful death action in Arizona. The probate court denied the motion stating, in relevant part:

> Derrick started his action in this Court over one year ago; his request for voluntary dismissals without prejudice and request for stay are clearly tactics to avoid a dispositive decision in this case. He has had ample opportunity to prove his case and has failed to do so.

This Court has held that a motion for voluntary dismissal should not be granted when the plaintiff's objective is to avoid an impending adverse determination and then subject the defendant to a second suit. See *McLean v McElhaney*, 269 Mich App 196, 202-203; 711 NW2d 775 (2005), rev'd on other grounds 480 Mich 978 (2007). Here, appellant had no reason to stay the proceedings in the probate court other than to avoid an adverse decision from that court. Further, appellant has not demonstrated that concluding the probate proceedings in Michigan will prejudice a separate wrongful death action in Arizona, and he has produced no evidence that would indicate he is likely to be successful in a wrongful death action against appellees. In these circumstances, it cannot be said that the trial court abused its discretion by declining to stay the probate proceedings while appellant litigates a wrongful death claim in a different forum.

Affirmed.

/s/ Elizabeth L. Gleicher
/s/ Michael F. Gadola
/s/ Anica Letica

-12-